UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROCESS CONTROL &
INSTRUMENTATION, LLC,

     Plaintiff/Counter-Defendant,   No. 12-15670

vs.              Hon. Gerald E. Rosen

EMERSON PROCESS MANAGEMENT
POWER & WATER SOLUTIONS, INC.,

     Defendant/Counter-Plaintiff.
_____/

OPINION AND ORDER REGARDING
MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on June 30, 2014

PRESENT: Honorable Gerald E. Rosen
      United States District Chief Judge

I. INTRODUCTION

   This breach of contract action arises out of a dispute concerning amounts Plaintiff

Process Control & Instrumentation, LLC ("PCI") claims are due and owing to it by

Defendant Emerson Process Management Power & Water Solutions, Inc. ("Emerson")

pursuant to a certain Master Services Agreement the parties entered into in March 2010,

and Defendant Emerson's counter-claim for set-off of amounts allegedly overcharged

and overbilled by PCI which Emerson claims it paid by mistake.  Both PCI and Emerson

1

have moved for summary judgment.  Responses and reply briefs have been filed.

Having reviewed and considered each party's motion for summary judgment, the parties' respective briefs and supporting evidence, and the entire record of this matter, the Court finds that the pertinent facts and legal contentions are sufficiently presented in these materials, and that oral argument would not significantly assist in the resolution of this matter.  Accordingly, the Court will decide this matter "on the briefs."  *See* Eastern District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

<u>The Parties</u>

Defendant Emerson Process Management Power & Water Solutions, Inc. is a global company which assists businesses in automating.  In 2000, Emerson contracted with the Detroit Water and Sewerage Department ("DWSD") to modernize its water and waste-water treatment complexes in order to improve operational efficiency, maintain regulatory and environmental compliance, and accommodate future system expansion. In addition to the design and construction of a modernized system, the DWSD contract called for Emerson to maintain the system for a period of time after it was installed, and to train DWSD operators, maintenance technicians and engineers to continue to do so.

In conjunction with the maintenance portion of the DWSD project, Emerson contracted with Plaintiff PCI to provide labor.  PCI would invoice Emerson for the labor

2

2:12-cv-15670-GER-DRG   Doc # 29   Filed 06/30/14   Pg 3 of 20   Pg ID 840

it provided and Emerson, in turn, would bill DWSD for the labor that was supplied.

The Master Services Agreement

In March 2010, Emerson and PCI entered into a Master Services Agreement ("MSA") governing the parties' rights and obligations with respect to the DWSD project. With respect to the personnel to be provided by PCI for work on the project, the Agreement sets forth specific educational and experience requirements for all relevant positions, including the positions of Control Instrument Engineer, Principal Engineer, Field Service Engineer, Senior Technician, Technician, Junior Control Technician, and Reliability Consultant. *See* Master Services Agreement, ¶ 2, pp. 2-3, Defendants' Ex. 1, Dkt. # 21-2, Pg. ID 183-84. Article 6 of the Agreement sets forth the terms pertaining to compensation of the personnel provided by PCI. In relevant part, Article 6 provides:

> Compensation shall be in accordance with the terms of the purchase order. For fixed-price purchase orders, the Contractor [PCI] shall perform the the purchase order at the price stated therein. **Where a cost-type purchase order is proposed, Contractor shall invoice as per the rate schedule shown in Attachment D. Contractor may only adjust such rates for Contractor's personnel if the Company [Emerson] is granted an increase by the City of Detroit Water and Sewerage Dpartment.** The increase that Contractor will receive will be the same percentage (but not the actual dollar increase) that Company is granted by the City of Detroit Water and Sewerage Department and only for the period that the increase is granted to the Company. . . .
>
> . . . The rates shown in Attachment D are average rates and are arrived at by calculating the average salaries of all Contractor Personnel in each classification. As salaries and/or personnel change through each year of this Agreement, the actual average rates may be slightly (but not significantly) different than those shown in Attachment D. The rates shown in Attachment D are only subject to change as defined elsewhere in

3

this Article 6.

*Id.* at ¶ 6, Dkt. # 21-2, Pg. ID 186 (emphasis added).

Attachment D to the Agreement sets forth the pay rates referenced in Article 6 by position title and job location (e.g., Waste Water Treatment Plant, Tap Water Treatment System, Central Services):

| Rate/Hr. | Position Title |
| --- | --- |
| $ 38.50 | Jr. Control Technician WWTP |
| $ 41.50 | Jr. Control Technician TWTS/WWCS |
| $ 55.00 | Instrument Technician WWTP |
| $ 60.00 | Instrument Technician TWTS/WWCS |
| $ 60.00 | Sr. Control Instrument Technician WWTP |
| $ 65.32 | Sr. Control Instrument Technician TWTS/WWCS |
| $ 67.39 | Field Service Engineer TWTS/WWCS |
| $ 82.60 | Field Service Engineer WWTP |
| $128.00 | Reliability Consultant TWTS/WWCS/WWTP |

Defendants' Ex. 2, Dkt. 21-3, Pg. ID 215.

Russell Yester, who executed the Master Services Agreement on behalf of Emerson, and Barry Clay, who executed the Agreement on behalf of PCI, both initialed Attachment D indicting their understanding and acceptance of the rates.

The Agreement also contained a merger clause which provided:

This Agreement and its attachments constitute the entire Agreement between Company and Contractor for the provision of services by Contractor and supersedes any prior written or oral agreements or

contemporaneous communications with respect to this subject matter.  No
subsequent amendment to this Agreement will be binding on a party unless
reduced to writing and signed by a representative of the party who is
authorized to sign such agreement.

Defendant's Ex. 1, ¶ 35.

The Staffing Process

When DWSD sought personnel for one of its sites, its formal request to Emerson

identified the job position by one of the titles set forth in Section 2 of the Agreement and

specified the location where the work was to be performed.  Emerson, in turn, would

forward the request to PCI which would provide Emerson with a set of resumes from its

list of candidates who possessed the required qualifications for the particular position.

Emerson would then forward the resumes to DWSD, and DWSD would select the

individuals it wanted for the available positions.  After DWSD made its decision,

Emerson would notify PCI as to which candidates were selected and where the

employees were to report to work.

PCI Invoices

The Agreement allowed PCI to bill Emerson every two weeks.  PCI personnel

were required to submit time sheets to Emerson after they were approved by DWSD's

supervisors at the job sites where they worked.  PCI was required to provide Emerson

with time sheets for every employee when it submitted invoices to Emerson.

From April 7, 2010 through July 15, 2012, Emerson received and paid invoices

submitted by PCI for the labor it supplied.  *See* Defendant's Ex. 3.  PCI's invoices for

this period included the name of the employee, the number of hours worked and an

hourly rate for the individual.  In August 2012, however, Emerson discovered that, since

April 7, 2010, PCI had billed for labor for its personnel at a higher rate than that which

was specified in Attachment D of the Master Services Agreement.  After PCI was made

aware of its billing errors, it submitted subsequent invoices to Emerson with the correct

billing rates.

Upon discovering the billing error with respect to the April 2010 - July 2012

invoices, Emerson reviewed each PCI invoice for that period and determined that PCI

had overbilled and Emerson had overpaid a total of $494.132.44.[1]  To offset this

overpayment, Emerson ceased payment on all post-July 2012 invoices until the overpaid

amount was recovered.

PCI has not paid back or credited Emerson for the overpayment, and Emerson has

not paid PCI for any of its post-July 2012 DWSD invoices.  According to PCI, these

unpaid invoices total $542,895.82.[2]

_____

[1]  The overbilled amount includes $462,294.20 overbilled as a result of its use of
incorrect hourly rates and additional overbilling items amounting to an additional
$31,438.24.

[2]  Emerson disputes the accuracy of PCI's claimed unpaid amount.  According to
Emerson, PCI's figure includes invoices prepared in 2013 that are unrelated to the
DWSD project, which, as of September 20, 2013, were being processed according to
normal payment terms as described in the applicable purchase orders.  *See* Affidavit of
Robert L. Timmerman, Emerson's Manager of Project Administration, Detroit Regional
Operations.  According to Timmerman, Emerson has only not paid $494.132.44, i.e., the
total amount it overpaid on the April 2010 - July 2012 invoices.  *Id.* at ¶ 7 and Affidavit
Exhibit A.

On November 29, 2012, PCI filed a breach of contract action in Wayne County

Circuit Court to recover the amounts due and owing on the unpaid invoices.  Emerson

removed the action to this Court and promptly filed a counter-claim to recover and offset

the amount it had overpaid on the April 2010 - July 2012 invoices against the amount

allegedly due and owing to PCI.   Each party now moves for summary judgment, and

each opposes the other's motion.

III.  DISCUSSION

A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule

56[] mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548,

2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a

light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813

(6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials,

but must "cit[e] to particular parts of materials in the record" as establishing that one or

7

more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any

supporting or opposing affidavits or declarations "must be made on personal knowledge,

set out facts that would be admissible in evidence, and show that the affiant or declarant

is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere

existence of a scintilla of evidence that supports the nonmoving party's claims is

insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal

quotation marks, and citation omitted). The Court will apply the foregoing standards in

deciding the parties' motions for summary judgment in this case.

B.    THE CONTRACT TERMS ARE NOT AMBIGUOUS

The amount owed to PCI as compensation for the personnel it provided to

Emerson for the DWSD project is governed by Article 6 of the Master Services

Agreement and Attachment D. Emerson contends that PCI billed it at higher rates than

those specified in Attachment D. Barry Clay, the president of PCI, however, testified in

his deposition that the rates set forth in Attachment D were only "average" rates and that

these "average" rates were meant only to be used only as "guideposts" for the actual

amount of compensation to be paid for each technician, which he testified is how the

parties had treated billing rates in previous dealings. *See* Clay Dep., pp. 33-39.[3] Thus,

_____

[3] Before the execution of the March 2010 MSA, PCI and Emerson operated under
the terms of a 2001 Master Services Agreement. Clay testified that "[t]hroughout the
history of the 2001 MSA the rates in Attachment D were never used, they were always a
guidepost." [Clay Dep., p. 34.]

according to Clay, there was no requirement that PCI bill Emerson at any "fixed" rate.

Clay further claims he and Russ Yester of Emerson had engaged in an "extensive

discussions" about the language in the second paragraph of Article 6 of the March 2010

Agreement about average rates. "If we weren't contemplating average rates there would

be no reason for this language to be there." *Id.* at p. 39.

The resolution of this issue raises a question of contract interpretation. The

primary goal of contract interpretation is to determine and enforce the parties' intent.

*Dobbelaere v. Auto-Owners Ins. Co.*, 275 Mich. App. 527, 529; 740 N.W.2d 503 (2007).

General principles of contract interpretation require that

> if contractual language is clear, construction of the contract is a question of law
> for the court. If the contract is subject to two reasonable interpretations, factual
> development is necessary to determine the intent of the parties and summary
> disposition is therefore inappropriate. If the contract, although inartfully worded
> or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous.
> The language of a contract should be given its ordinary and plain meaning.

*Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 721-22; 565 N.W.2d 401 (1997)

(internal citations omitted). It is only when a contract is ambiguous that the court may

consider extrinsic evidence. *See Klapp v. United Ins. Group Agency, Inc.*, 468 Mich.

459, 469, 663 N.W.2d 447 (2003). The Court finds no such ambiguity in the language of

Article 6 of the 2010 MSA or Attachment D thereto.

Article 6 clearly required PCI to invoice Emerson using the rates shown in

Attachment D and provided that PCI could only adjust the rates for its personnel if

Emerson were granted an increase by the City of Detroit Water and Sewerage

Department.  Contrary to Barry Clay's assertions, nothing in the Agreement suggests that the rates in Schedule D should be viewed only as average rates to be used as in the parties' prior dealings only as "guideposts."  Gregory Betz, Emerson's Detroit Regional Manager acknowledged that although there was a similar "Attachment D" schedule of rates in the 2001 MSA, "the problem with th[at] MSA [was] it didn't tell them to bill these rates. . . . [It] didn't establish set rates."  Betz  Dep., pp. 38-39.  "And, that's what was fixed in the second -- the newer MSA."  *Id*. The 2010 MSA clearly and unequivocally states,  "Contractor ***shall*** invoice as per the rate schedule shown in Attachment D."  [MSA, ¶ 6 (emphasis added).]  "The plain and ordinary meaning of the word 'shall' requires mandatory action."  *AFSCME v. City of Detroit*, 267 Mich. App. 255, 260, 704 N.W.2d 712 (2005).

The only discussion of "average" rates appears in an entirely separate paragraph, in a discussion of how the rates in Attachment D were arrived at -- i.e., by averaging the various rates paid by PCI to its various employees in each respective job classification -- and explaining that the actual average of PCI salaries might vary from year to year, and, therefore, the rate shown, being fixed for three years, might differ slightly from the actual average in any given year.[4]

---

[4]  Prior to the 2010 MSA, the rate PCI billed Emerson was determined on an employee-by-employee basis. [*See* Barry Clay Dep., pp. 40-42; Gregory Betz Dep., p. 39.] As PCI hired additional labor, the parties negotiated separate rates for each new employee.  *Id*.  According to Emerson, utilizing different billing rates for employees with the same job title proved difficult to manage and budget. The 2010 Agreement and the

There being no ambiguity in the contractual provisions, evidence of the parties' prior treatment of contract rates or the negotiation of the rate is irrelevant and cannot be considered.  As explained by the Michigan Court of Appeals in *UAW-Human Resources Center v. KSL Recreation Corp.*, 228 Mich. App. 486, 579 N.W.2d 411 (1998):

> "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co*., 184 Mich. App. 574, 580, 458 N.W.2d 659 (1990). This rule recognizes that in "[b]ack of nearly every written instrument lies a parol agreement, merged therein." *Lee State Bank v. McElheny*, 227 Mich. 322, 327, 198 N.W. 928 (1924). "The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing." 4 Williston, Contracts, § 631. In other words, the parol evidence rule addresses the fact that "disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts." Fried, Contract as Promise (Cambridge: Harvard University Press, 1981) at 60.

---

rate structure in Attachment D which was dependent upon job title and location was intended to ease that difficulty.  [*See* Deposition of Russell Yester, pp.41-42]  With the execution of the 2010 Agreement, the parties negotiated billing rates that were fixed for three years and would not change, except when the DWSD allowed for increases.

Thus, PCI could not invoice Emerson for employees assigned to the DWSD project at any rates other than the rates specified in Attachment D for three years, even if PCI had itself contracted to pay the employees more.  As Russell Yester explained, by way of an example, if  after 18 months on the job, an employee of PCI was entitled to a $2 an hour raise from PCI, PCI could not add that salary increase to the amount it invoiced Emerson:  "We had nothing to do with what [Barry Clay] paid his employees. That was their private business. . . .  So that is what that compensation section was about. That was it.  There would be no change in what they billed us, period, except as described in the first paragraph which said if the City of Detroit gave us an increase, we would give PCI an increase, and that increase mechanism is defined.  That's the only way we would pay a different price."  [Yester Dep., pp. 41-42.]

11

228 Mich. App. at 492, 579 N.W.2d at 414.

The Court is particularly persuaded that the parties' prior course of dealing or prior understandings and agreements are not to be considered where, as here, the contract at issue contains a merger clause which states, "This Agreement and its attachments constitute the entire Agreement between Company and Contractor for the provision of Services by Contractor and supersedes any prior written or oral agreements or contemporary communications with respect to this subject matter."  *See* MSA § 35.

The purpose of a merger clause stating that there are no agreements or understandings between the parties is to prevent either party from relying upon statements or representations made during negotiations that were not included in the final agreement.  *Coal Resources, Inc. v. Gulf & Western Indus., Inc.,* 756 F.2d 443, 447 (6th Cir. 1985); *see also,UAW–GM Human Resource Ctr. v. KSL Recreation Corp*., 228 Mich. App. 486, 507 n. 14, 579 N.W.2d 411 (1998) ( "The raison d'être of an integration clause is to prohibit consideration of parol evidence by nullifying agreements not included in the written agreement." *Id*.); *Hamade v. Sunoco, Inc. (R & M)*, 271 Mich. App. 145, 171, 721 N.W.2d 233 (2006) (a merger or integration clause nullifies all prior and contemporaneous agreements, understandings, and representations).

For the foregoing reasons, the Court concludes that PCI may not rely upon Barry Clay's deposition testimony about the parties' prior dealings or understandings, or the parties' negotiations of the contract in order to create an issue of fact.

2:12-cv-15670-GER-DRG   Doc # 29   Filed 06/30/14   Pg 13 of 20   Pg ID 850

C.    PCI IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER ARTICLE 35
      OF THE MSA

PCI further argues that Emerson's electronic approval[5] of the allegedly overbilled

PCI invoices for payment constituted an amendment of the Agreement that allowed PCI

to bill for its employees at whatever hourly rates were stated in the invoices.  Therefore,

PCI claims that there was no unauthorized overbilling.

In support of this argument, PCI relies upon the second sentence of Section 35 of

the MSA (the first sentence of which contains the merger clause discussed above).  The

second sentence of Section 35 states, "No subsequent amendment to this Agreement will

be binding on a party unless reduced to writing and signed by a representative of the

party who is authorized to sign such agreement."  MSA ¶ 35.  PCI contends that the

"coding" electronically imprinted on the invoices constitutes the signature of a

_____

    [5]  John Sopko, who at the time was Emerson's North America controller, testified
that PCI's invoices were electronically approved by an Emerson project manager prior to
being paid.  He explained:

        The invoice is scanned into a central location or mailed into a central
        location.  It gets scanned into the system, Data Serve, and then
        electronically, the project manager receives a notification that he has an
        invoice for review and approval.  Manager goes in, pulls up that invoice
        and electronically approves it.

[Sopko Dep., pp. 23-24.]

    The electronic approval of the invoice is reflected by a "coding" imprinted on the
invoice.  *See* Emerson's Response to Plaintiff's Request to Produce No. 1, Plaintiff's SJ
Ex. 3.

representative of Emerson who is authorized to sign an agreement amending the MSA to allow the billing of rates higher than those specified in Attachment D.  PCI further argues that because Section 35 does not state that the signature of <u>both</u> parties is required to effectuate an amendment, once the coding of the invoice-reviewing manager was imprinted on the invoice, the MSA was immediately amended to reflect whatever rate of pay was contained in that particular invoice.

Not surprisingly, Plaintiff offers no factual or legal support for its claim that the electronic invoice approval notation of a project manager constitutes a "signature" let alone the signature of a party-representative who was authorized to sign an agreement amending the MSA.  Without evidentiary support, authority to approve an invoice does not *ipso facto* constitute authority to amend the Master Services Agreement.  Moreover, the testimony of Barry Clay, PCI's own president, belies any argument of any amendment changing the billing rates provided in Attachment D invoice by invoice:

> Q:  Mr. Clay, looking at Attachment D to the 2010 MSA, did those rates ever change?
> A:  In the contract?
> Q:  Yes.
> A:  **There was no new contract issued to change those rates**.
> Q:  So, from the first time an individual was billed at a certain rate that rate remained the same throughout the period of the 2010 MSA? Do you understand my question?
> A:  I think I do.  **From the time we issued our new billing pursuant to what we thought was the new 2010 MSA our rates did not change for an individual.**
> Q:  They remained fixed?
> A:  They remained fixed.

14

[Clay Dep., pp. 64-65 (emphasis added).]

For the foregoing reasons, the Court finds no basis for Plaintiff's theory of an invoice-by-invoice amendment of the billing terms of MSA pursuant to Section 35 of the Agreement.

D.    PCI IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER SECTION 8
      OF THE MSA

PCI also relies on Section 8 of the MSA as support for its contention that there was no unauthorized overbilling.  Section 8 of the MSA provides:

Billing and Payment

Contractor shall submit to Company, not more frequently than twice monthly, invoices for Services performed and the balance due to Contractor in accordance with the procedures set forth in Attachment A hereof. Company agrees to pay within sixty (60) days from the date of receipt of accurate and undisputed invoices.

PCI's theory is that, pursuant to the second sentence of Section 8, Emerson had sixty days to review the PCI invoices and if Emerson paid within sixty days, the invoices were deemed to be accurate and undisputed.  Hence, because Emerson paid 54 of the 57 disputed invoices within 60 days, PCI claims that they must be viewed as no longer subject to dispute and, as a consequence, Emerson has no right to now claim they were inaccurate and mistakenly paid, or to offset the amount of any overpayment against unpaid invoices.

There is, however, no language in Section 8 or in PCI's invoices stating that invoices are "deemed" to be accurate and undisputed if paid timely, within 60 days.

15

Section 8 merely indicates that Emerson agrees to pay within 60 days from the date of receipt of accurate and undisputed invoices. Plaintiff may not simply insert language which is not present anywhere in the Agreement to reach a favorable result.  Further, there is no contractual limitation or language in this section or anywhere else in the Agreement precluding Emerson from seeking reimbursement of overpayments to PCI after inaccurate invoices were paid.  In fact, Section 8 is silent regarding procedures in the event Emerson receives invoices that are inaccurate.  In sum, nothing in this Section authorizes or sanctions PCI's billing for services at a rate higher than that contained in the contract.

For all of the foregoing reasons, the Court concludes that nothing in the PCI-Emerson Master Services Agreement or Attachment D authorized PCI to bill Emerson for the services of employees on the DWSD project at any rate other than those specified in Attachment D.  There is no dispute that PCI did not adhere to those rates in billing Emerson for work done from April 7, 2010 through July 15, 2012.  Therefore, PCI cannot insist on payment from Emerson for work done by PCI employees which was billed at the wrong rate of pay.

E.      EMERSON IS ENTITLED TO RECOVER AMOUNTS OVERPAID

It is well-settled that a voluntary payment made with a full knowledge of all the circumstances upon which it is demanded cannot be recovered back.  *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 284, 47 N.W. 607, 611-12 (1951) (citing *Pingree v.*

*Mutual Gas Co.*, 107 Mich. 156, 157, 65 N.W. 6, 7 (1895)).  However, "a payment, although voluntarily made, if made under a mistake of a material fact, may be recovered, even if the mistake be due to a lack of investigation.'" *Montgomery Ward, supra*, 330 Mich. at 284, 47 N.W. 607, 611-12 (quoting *Couper v. Metropolitan Life Insurance Company*, 250 Mich. 540, 544, 230 N.W. 929, 931 (1930)); *Pingree v. Mutual Gas Co.*, 107 Mich. at 157, 65 N.W. at 7.

Under Michigan law, when one is over-billed and then mistakenly submits full payment in response to that bill, one has made a mistake of fact.  *See Wilson v. Newman*, 463 Mich. 435, 617 N.W.2d 318, 320–21 (2000) (discussing *Shield Benefit Administrators, Inc. v. University of Mich. Bd. of Regents*, 225 Mich. App. 467, 571 N.W.2d 556 (1997)); *Capitol Title Ins. Agency v. Towne Mortgage Co.*, 2009 WL 609561 at *4 (Mich. App. Mar. 10, 2009) (payment made under a mistake of fact can be recovered even if the mistake could have been avoided by the payor); *see also Durant v. ServiceMaster Co.*, 159 F. Supp. 2d 977 (E.D. Mich. 2001) (applying Michigan law).  In *Durant*, the defendants wrongfully added a "fuel surcharge" of $1.00 to their lawn care customers' bills each month for at least six months and the plaintiffs mistakenly submitted full payment of those bills to the defendants.  Relying on *Wilson*, the court found that the plaintiffs' overpayments to defendants constituted payments made under mistakes of fact.  159 F. Supp. 2d at 981. Therefore, the doctrine of voluntary payment was no bar to plaintiffs' action.  *Id.*

17

The same is true with respect to Defendant Emerson's counter-claim in this case. Under Michigan law, Emerson is entitled to recover the amounts it overpaid. It matters not that Emerson could have discovered PCI's billing errors had it more carefully examined the invoices before authorizing payment. Payments made by mistake may be recovered, "[even] though 'there was negligence on the part of the person making payment.'" *Wilson*, 617 N.W. 2d at 321 (quoting *Walker v. Conant*, 31 N.W. 786, 787 (Mich.1887)). Further, PCI has not come forward with any evidence showing detrimental reliance on Emerson's mistaken payment, nor any evidence that return of the overpaid amounts to Emerson would adversely affect innocent third parties.[6]

For all of these reasons, the Court concludes that Emerson is entitled to recover from PCI the $494,132.44 it overpaid on the April 7, 2010 - July 15, 2012 invoices, and offset that amount against any sums remaining due and owing to PCI on any unpaid invoices.[7]

---

[6] The law regarding mistaken payments is the same as it is for unjust enrichment: recovery is precluded if the party who received the mistaken payment "can demonstrate a change of position or detrimental reliance as a consequence of having received the mistaken payment . . . ." *Wilson* at 322.

[7] PCI makes no direct argument opposing Emerson's proposed offset of overpayments against amounts remaining due and owing to PCI on post-July 2012 invoices. However, in a back-door fashion, PCI does make one argument contesting Emerson's withholding of payment on accounts due: PCI argues that pursuant to Section 7 of the MSA, Emerson was only entitled to withhold 25% of the amount owing. Section 7 provides:

Notwithstanding anything to the contrary, Company shall have the right to withhold from payment due Contractor such sums as are reasonably

18

<u>CONCLUSION</u>

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **[Dkt. # 21]** is GRANTED and Plaintiff's Motion for Summary Judgment **[Dkt. # 22]** is DENIED.  Accordingly,

IT IS FURTHER ORDERED that Defendant shall be entitled to offset the $494,132.44 overpaid (and not refunded) on Plaintiff's April 7, 2010 - July 15, 2012 invoices against amounts remaining due and owing to Plaintiff.

IT IS FURTHER ORDERED that within 14 days of the date of this Opinion and Order, Plaintiff shall file and serve upon Defendant a verified Affidavit of the total

---

necessary to protect Company against any loss or damage which may result from Contractor's failure to perform, negligent or unsatisfactory work, or such acts and omissions by Contractor or for claims filed against Company by third parties relating to Contractor's performance of Services (provided, however, Company shall in no event withhold more than twenty-five percent [25%] of a single invoice in any such case).  Any such sums withheld from Contractor as provided in this article which subsequently are determined to be due to Contractor shall thereupon be due and payable to Contractor.

Contrary to PCI's assertions, this Section is inapplicable here.  PCI does not claim that Emerson withheld payment of its invoices because it [PCI] failed to perform or its performance was negligent or unsatisfactory.  The dispute in this case does not concern issues related to the quality of services provided by PCI.  Rather, the dispute is a billing dispute.  In fact, nothing in Section 7 addresses the withholding of payment as an offset which is what Defendant Emerson did when return of the previously overpaid funds was not forthcoming. The only rule applicable to the withholding of payment here is whether it was reasonable for Emerson to do so.  The Court finds that Emerson acted reasonably under the circumstances presented.

19

amount due and owing by Defendant, less the $494,132.44 offset amount.  Defendant

shall have 5 days after receipt of Plaintiff's Affidavit to file any objections thereto.


                                   s/Gerald E. Rosen
                                   Chief Judge, United States District Court

Dated:  June 30, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 30, 2014, by electronic and/or ordinary mail.

                                   s/Julie Owens
                                   Case Manager, (313) 234-5135